U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

**FILED**

MAR 14 2012

CLERK, U.S. DISTRICT COURT
by_____
         Deputy

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

BRENDA MITCHELL,                  §
                                  §
          Plaintiff,              §
                                  §
VS.                               §   NO. 4:10-CV-889-A
                                  §
SIKORSKY AIRCRAFT CORPORATION,    §
                                  §
          Defendant.              §

MEMORANDUM OPINION
and
ORDER

Came on for consideration the motion of defendant, Sikorsky
Aircraft Corporation, for summary judgment as to all claims and
causes of action brought against it by plaintiff, Brenda
Mitchell.  Plaintiff filed nothing in response to the motion.
Having now considered the motion, the summary judgment record,
and applicable legal authorities, the court concludes that the
motion should be granted.

I.

Plaintiff's Claims

Plaintiff initiated this action on November 23, 2010, by the
filing of her original complaint asserting claims against
defendant for retaliation in violation of Title VII of the Civil
Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e - 2000e-17,
and 42 U.S.C. § 1981.

II.

## The Motion for Summary Judgment

Defendant contends that it is entitled to summary judgment on plaintiff's claims of retaliation because: plaintiff is unable to establish a prima facie case of retaliation, as she did not engage in any protected activity and many of the actions of which she complained were not adverse employment actions; she is unable to show that defendant's reason for her termination is a pretext for retaliation; and, she cannot establish that defendant would not have terminated her employment "but for" any alleged protected activity.

III.

## Undisputed Facts

The following facts are undisputed in the summary judgment record:

Plaintiff began working in defendant's Fort Worth office in September 2008 as a reliability engineer.  Plaintiff's supervisors were Phillip Hensley ("Hensley") and Matthew Gogal ("Gogal"), both of whom worked in defendant's offices in Stratford, Connecticut.  John Amsden ("Amsden") was the office manager at the Fort Worth office where plaintiff worked, and Sandra Brown ("Brown") was the Fort Worth office administrator.

On January 29, 2010, plaintiff sent the following email to

2

Amsden, with copies to Hensley, Gogal, and Brown:

> I am writing in reference to the UTC zero tolerance
> policy in the work palace.  I personally witnessed an
> image today that was very disturbing and offensive
> posted on the professional billboard in our office.  I
> have seen other inappropriate language posted in
> cubicles in plain sight related to this same issue.  I
> removed and shredded the image of 'Dark Vader' with
> President Obama's face superimposed over Dark Vader's
> face.
>
> My first reaction was "what would make a person believe
> placing an image with what I perceived to have racist
> overtones....in a governmental funded office....very
> audacious?"  This office is funded by the people and
> there are many different political passions and
> opinions among my co-workers.  I would hope that out of
> respect for their fellow co-workers those passions and
> opinions would stop at door of this facility.
>
> I have endured some disturbing and offensive political
> discussions, but the image today was over the top.  In
> the future, I would respectfully request that no
> further political images or discussions be held in
> proximity to an emotionally violated co-worker.
>
> The irony of this incident is I am a registered
> independent and was a state-delegate for President G.W.
> Bush (voted for him in 2000' & 2004').  I would be just
> as offended if it was a demeaning, and belittling
> (racist--in my opinion) image of him while he served as
> OUR president.  I voted for President Obama this
> election.
>
> Again with all due respect, if I over hear or I am told
> by another co-worker that they had to sit and cringed
> as they listened to a demeaning conversation about our
> president or if I witness any more disturbing images I
> will be forced to report the incident to Human
> Resources.  It is my hope this matter will be resolved
> internally.

App. to Br. in Supp. of Def.'s Mot. for Summ. J. ("App.") at 79-

80 (errors and ellipses in original).[1]  A short time later
Hensley replied via an email wherein he thanked plaintiff for
bringing the matter to his attention and indicated he would
discuss it with Amsden.

The email was copied to Colin Cain ("Cain") in defendant's
human resources department.  Cain spoke with Amsden about the
email and instructed him to send an email to all employees of the
Fort Worth office reminding them that no political messages or
images should be posted on the company bulletin board.

After talking with Cain, later that same day Amsden sent the
following email to all employees in defendant's Fort Worth
office:

> There are two subjects in which passions can create
> tension--politics and religion.  I would remind each of
> you to refrain from potentially offensive discussions
> concerning religion and our President.  Under NO
> circumstances should photos/images opposed to our
> President be displayed in the office.
>
> If you question whether something could be offensive--
> it probably could and it should not be displayed.

Id. at 81.  Amsden, Cain, and Hensley agreed that the email was a
sufficient response to plaintiff's complaint.

On February 3, 2010, plaintiff emailed Hensley and Gogal,
complaining about the following typewritten note posted on the

---

[1]Plaintiff at her deposition testified that she erroneously typed "Dark Vader" in this email when
she intended to type "Darth Vader."  App. at 35.

company bulletin board:

> "When times are tough, you tighten your belts," You
> don't go buying a boat when you can barely pay your
> mortgage.  You don't blow a bunch of cash on Vegas when
> you're trying to save for college.

> Nope, you hand it over to the Federal Government.

Id. at 82 (quotation marks in original).  In her email plaintiff
referred to the posting as "political propaganda" posted by
"radical individuals" and asked Hensley to "do what you deem
necessary to reign these folks in."  Id.

Following plaintiff's February 3, 2010 complaint, Amsden
sent another email to all employees in the Fort Worth office
regarding the company bulletin boards:

> The bulletin boards located in the office are there to
> provide a communication vehicle for [defendant] events
> and announcements.  They are not intended to provide a
> platform for employees to express their opinions or to
> provide derogatory information about the company, the
> government, etc....

> Let's make the direction simple.  If you would like to
> add or remove anything from the bulletin boards bring
> it to Sandy or myself for action.  If you have
> questions about this guidance--feel empowered to stop
> by and ask me.

Id. at 84.  Neither of Amsden's emails mentioned plaintiff or
referred to her previous complaints.

On or around March 8, 2010, plaintiff called Cain and
complained that in mid-February a coworker named Mike Savage
("Savage") made a motion as if he were going to kick plaintiff as

5

he followed her into an elevator.  In a letter sent to Cain a few
days later, plaintiff elaborated on the incident:

> Let me state the specifics of what happened during
> Mike's threat towards me:  I arrived at the elevator
> the same time as Mike and Bradley.  The elevator doors
> open and Bradley holds his hand out and says "Ladies
> first."  I walked into the elevator and as Mike entered
> the elevator behind me he lifted up his leg and
> motioned as if he was going to kick me.  Based on the
> angle of the camera and possibly due to Mike being in
> the frame of the elevator you may not be able to
> determine that his leg is raised towards me.  As the
> elevator door closes Mike asks me very sarcastically
> and abrasively, "You are the one down here causing
> trouble...right?"  I answered with "no its' called
> righteous indignation."  The elevator opens I walk out
> the back door and they proceed out the front door.  I
> felt very frightened number one because this guy had
> just raised his foot at me and now he asking me was I
> causing problems in the office.  As a petite woman I
> would not have been able to defend myself if anything
> else had occurred behind closed doors in the elevator.
> I choose to document the event.

Id. at 88 (errors and ellipses in original).  Cain, along with
Savage's manager, interviewed Savage concerning plaintiff's
allegations.  Savage did not remember doing any of the things
plaintiff accused him of doing, but did recall plaintiff acted
strangely during the elevator ride; for example, she did not
respond when he said hello to her.  Given the conflicting
stories, Cain only gave Savage a verbal warning to have no
further contact with plaintiff.  Plaintiff made no further
complaints against Savage.

On March 5, 2010, Amsden sent all Fort Worth employees the

following email titled "Harassment Free Workplace":

> Folks--I am again required to remind you that
> [defendant] as [sic] a zero tolerance, harassment free
> workplace.  An issue has been brought to my attention
> that if substantiated will result in disciplinary
> action.

> What you may consider "high jinx" can be viewed as
> harassment by the affected employee.

> Folks--we are required to treat each other with
> respect.  I do not know how to state it more clearly.

Id. at 89.  Amsden sent the email in response to a complaint by a

contract employee that someone had poured out his salad dressing

and moved items on his desk.  However, plaintiff believed that

Amsden issued the email because an employee named Aaron Brieger

("Brieger") filed a complaint about her in retaliation for her

complaint about the picture of President Obama, although the

undisputed summary judgment evidence shows that Brieger never

filed a complaint of any kind against plaintiff.

On March 10, 2010, plaintiff sent Cain a letter, the overall

tone of which expressed plaintiff's belief that unnamed

individuals were engaged in covert attempts to "malign and

discredit" her.  Id. at 86.  In the letter, plaintiff noted that

she "ha[d] endured over a month's worth of orchestrated covert

efforts to a) push [her] out, b) paint [her] as an out of control

manipulative employee . . . ."  Id. (emphasis in original).

Plaintiff asked Cain to have someone check the cameras near the

fourth floor elevators to see if they contained video footage
showing Savage making a kicking motion towards her.  Plaintiff
also expressed concern that First Command, the building
management company, might have erased the video, and stated that
her "latest observation" was of "an orchestrated effort to the
point of attempting to manipulatively . . . use some of [her]
closest coworkers . . . to vouch that they are not doing anything
at this point. . . ."  Id. (emphasis in original).  Plaintiff
also wrote that she had told her coworkers she was not
associating with them so they would not "suffer any consequences
due to the back and forth I now find myself."  Id.

     Plaintiff sent Cain a second letter around March 13, 2010,
complaining that although Savage "feels he has been exonerated"
from plaintiff's complaint against him, "[o]ne thing he is not
exonerated from and I am....is a lie detector test."  Id.
(ellipses in original).  The letter further stated:

>     [W]hen I called you on my cell phone and asked you to
>     have the video film checked to support my report of
>     [Savage's] threat happening...I noticed that [Amsden]
>     left early that afternoon as I was standing in the hall
>     calling you on my cell phone (video can confirm
>     this)...which never happens.  Again, could have been a
>     coincidence and I don't have any tangible evidence to
>     validate this...at this point I do not put it past
>     [Amsden] to have gone to First Command to ask that this
>     video footage somehow be edited or disappear all
>     together.
>
>     I have noticed that I have been followed and watched

before work and during my lunch break by the First
Command security officer on more than one occasion
(again he will deny it as well).

Id. at 87 (ellipses in original).  Following his receipt of

plaintiff's letters, Cain interviewed Amsden regarding

plaintiff's accusations, which Amsden denied.  Amsden also

confirmed that he had not contacted First Command about editing

videotape nor had he requested security officers to follow or

watch plaintiff.

On May 26, 2010, plaintiff again emailed Cain, accusing

Amsden of harassing her because he issued an email to all Fort

Worth employees, informing them that they were no longer allowed

to park across the street at a bank building.  In her email

plaintiff characterized Amsden's email as "another egregious

antic by [Amsden] attempting to harass and intimidate me in any

and all aspects."  Id. at 98.  In Cain's conversation with Amsden

regarding the email, Amsden explained that he sent the email

following a request by the building management company concerning

parking.

On July 26, 2010, one of plaintiff's coworkers, Kristopher

Haydel ("Haydel"), emailed Amsden concerning certain behavior and

actions of plaintiff that he found disturbing.  According to

Haydel, on a recent occasion he ran to catch an elevator just as

it was about to close.  Plaintiff was in the elevator, and as he

ran in, Haydel made a comment about getting to it just in time.
In response, plaintiff gave Haydel a "mean" look, said "Humph,
you go ahead," then "walked off the elevator with a noticeably
disgusted attitude." Id. at 100.  A short time later, Haydel
again saw plaintiff and she "stared [him] down" as she walked
towards her door.  Id.  On other occasions after that, Haydel
noticed plaintiff's "leering glares" at himself and others, and
felt "that her actions towards [him were] negative and angered,
yet without provocation." Id. at 101.

Also in July 2010, one of defendant's employees, Vicki
Bouquillon ("Bouquillon"), told Amsden about her conversation
with a Federal Express driver concerning plaintiff.  The driver
told Bouquillon that when he parked in front of the building to
make a delivery he saw a woman using a handheld video camera.
She appeared to be filming either the driver as he entered the
building or the front of the building.  From his description of
the woman Bouquillon recognized plaintiff.  The driver said he
made a joking comment about the filming but the woman did not
respond and continued filming.

In August 2010, Amsden received two telephone calls from a
police officer who informed him that plaintiff had filed a
complaint alleging she was being stalked and followed.  The
officer asked Amsden if he had ever followed plaintiff to her

10

home or place of worship, which Amsden denied.  The police
officer also asked if Amsden would be surprised to know that
plaintiff had started alternating her routes to and from work and
her place of worship; Amsden responded he had no knowledge
regarding that subject.  The police officer stated her belief
that plaintiff was "suffering from some type of paranoia," and
never contacted Amsden again.  Id. at 14.

On August 18, 2010, Brown learned from a former employee
that plaintiff had informed the former employee she intended to
acquire a concealed handgun license and "had plans to improve her
shooting accuracy."  Id. at 15.  Concerned about plaintiff due to
her "erratic conduct" over the previous few months, id., Amsden
contacted Cain with the information.

On August 19, 2010, Amsden, Cain, and Hensley had a
conference call to discuss plaintiff's well-being and whether she
presented a safety risk to herself or others.  Given their
concerns, the decision was made to immediately place plaintiff on
temporary leave pending a consultation with defendant's medical
department.  Later that day, Amsden met with plaintiff in person,
with Cain and Hensley participating via telephone, and explained
to plaintiff that she was being placed on temporary paid leave
pending further instructions.  Plaintiff left the office without
incident.

11

From August 20 to 23, 2010, Cain and defendant's medical director, Carol Kagdis ("Kagdis"), looked for neuropsychiatric specialists in the Fort Worth area and made arrangements for an independent psychiatric evaluation of plaintiff.

On August 26, 2010, Christine Cassina ("Cassina"), an employee in defendant's human resources department, sent plaintiff a certified letter describing the "numerous issues and incidents," described supra, that had caused defendant concern about the safety of plaintiff and defendant's other employees. The letter informed plaintiff that "[d]ue to this significant change in your behavior, we are seriously concerned for your well being, as well as the safety of our other employees." Id. at 103. The letter instructed plaintiff to return a signed acknowledgment and a signed release form to Kagdis. The letter advised plaintiff that she was required to either authorize defendant's medical department to contact her physician, or to comply with a fitness-for-duty evaluation by another physician at the company's expense. Finally, the letter warned plaintiff that her failure to cooperate could lead to the termination of her employment.

Plaintiff failed to respond to the letter. Consequently, on September 7, 2010, Cassina sent plaintiff a second letter, reminding her of the requirements of the August 26, 2010 letter.

The letter again directed plaintiff to either comply with the request for an independent medical evaluation or sign and return the required release forms to allow Kagdis to consult with plaintiff's physician.  The letter advised plaintiff that if she failed to comply by September 10, 2010, defendant would assume she had abandoned her position and would terminate her employment.

Plaintiff's only response to defendant's letters was a September 9, 2010 letter indicating she would not comply with either of defendant's requests, but would allow her physician to release "ONLY information in general terms that does not communicate specific information."  Id. at 112 (emphasis in original).  The information which plaintiff indicated she would release was a physician's summary completed on June 29, 2010, that did not address the concerns set forth in defendant's August 26, 2010 letter.

As a result of plaintiff's failure to comply, defendant on September 14, 2010, sent plaintiff a letter informing her that due to her failure to comply with the August 26 and September 7, 2010 letters, her employment was terminated due to job abandonment.

IV.

## Applicable Summary Judgment Principles

Rule 56(a) of the Federal Rules of Civil Procedure provides that the court shall grant summary judgment on a claim or defense if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986).  The movant bears the initial burden of pointing out to the court that there is no genuine dispute as to any material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323, 325 (1986).  The movant can discharge this burden by pointing out the absence of evidence supporting one or more essential elements of the nonmoving party's claim, "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Id. at 323.

Once the movant has carried its burden under Rule 56(a), the nonmoving party must identify evidence in the record that creates a genuine dispute as to each of the challenged elements of its case.  Id. at 324.  See also Fed. R. Civ. P. 56(c) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . .").  If the evidence identified could not lead a rational trier of fact to find in favor of the nonmoving party

14

as to each essential element of the nonmoving party's case, there is no genuine dispute for trial and summary judgment is appropriate. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587, 597 (1986).

V.

<u>Analysis</u>

A.  <u>Evidentiary Framework</u>

To evaluate claims of retaliation under Title VII, absent direct evidence, the court looks to the evidentiary burden-shifting framework of <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973), as modified by <u>Desert Palace, Inc. v. Costa</u>, 539 U.S. 90 (2003); <u>Septimus v. Univ. of Houston</u>, 399 F.3d 601, 607 (5th Cir. 2005).[2]  This framework requires plaintiff first to make out a <u>prima facie</u> case.  <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 506 (1993).

If plaintiff makes out a <u>prima facie</u> case, a presumption of retaliation arises and the burden shifts to defendant to articulate a legitimate, non-retaliatory reason for its actions. <u>Id.</u> at 506-07.  If defendant meets this burden of production, "any presumption of retaliation drops from the case" and the

---

[2]Claims of retaliation under § 1981 are analyzed and evaluated in the same manner as such claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e.  <u>Shackelford v. Deloitte & Touche, LLP</u>, 190 F.3d 398, 403-4 n.2 (5th Cir. 1999).  Accordingly, the analysis in Section V applies to plaintiff's claims under Title VII and § 1981.

burden shifts back to plaintiff to prove that the employer's proffered reason is actually a pretext for retaliation.  <u>Baker v. Am. Airlines, Inc.</u>, 430 F.3d 750, 755 (5th Cir. 2005) (internal citation omitted).  The plaintiff bears the ultimate burden to show that protected activity was a "but for" cause of the adverse employment action--that is, "that the adverse employment action taken against the plaintiff would not have occurred 'but for' her protected conduct."  <u>Septimus</u>, 399 F.3d at 608 (internal citation omitted).

B.    <u>The Merits</u>

As plaintiff has presented no direct evidence of retaliation, the court considers her claims using the burden-shifting framework.

Defendant argues that plaintiff is unable to establish a <u>prima</u> <u>facie</u> case of retaliation, but even if she could, she has failed to offer competent summary judgment evidence to show that defendant's legitimate, non-discriminatory reason for her termination was a pretext for unlawful retaliation, and she failed to establish "but for" causation.  Although the court is inclined to agree with defendant's arguments concerning plaintiff's <u>prima</u> <u>facie</u> case, that issue need not be resolved, as it is clear that plaintiff has adduced no summary judgment

16

evidence of pretext.[3]

Defendant's burden with regard to establishing a non-retaliatory reason for its actions is one of production; thus, "[i]f the employer produces any evidence 'which, taken as true, would permit the conclusion that there was a non[retaliatory] reason for the adverse action,' then the employer has satisfied its burden." Daigle v. Liberty Life Ins. Co., 70 F.3d 394, 396 (5th Cir. 1995) (internal citation omitted).

Here, the summary judgment evidence establishes that defendant had concerns about whether plaintiff posed a safety risk to herself or others. Defendant sent plaintiff two letters outlining its concerns and requiring her to provide medical information to address those concerns. The summary judgment evidence establishes that defendant terminated plaintiff's employment only after she failed to comply with either of the letters. Failure to comply with an employer's directive is a legitimate, non-retaliatory reason for termination, and defendant has satisfied its burden of production. See, Chaney v. New Orleans Pub. Facility Mgmt., Inc., 179 F.3d 164, 167-68 (5th Cir.

---

[3]In her complaint plaintiff alleged a list of occurrences that, along with her termination, appear to comprise her retaliation claims. Defendant has offered uncontroverted summary judgment evidence that a number of the allegations never occurred. Others are unsubstantiated in the summary judgment record. The court concludes that plaintiff's termination constitutes the only adverse employment action at issue here. See, e.g., Aryain v. Wal–Mart Stores Tex. LP, 534 F.3d 473, 484-86 (5th Cir. 2008).

1999) (failure to follow employer's directives legitimate reason for termination).

The burden then shifts to plaintiff to produce competent summary judgment evidence of pretext, which she can accomplish "either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence." Jackson v. Cal-Western Packaging Corp., 602 F.3d 374, 378-79 (5th Cir. 2010) (internal citations omitted). Plaintiff has adduced nothing to dispute or rebut defendant's legitimate reason for her termination. Absent any such evidence, subjective claims of retaliation are insufficient to defeat summary judgment. Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996).

VI.

Order

Therefore,

The court ORDERS that defendant's motion for summary judgment be, and is hereby, granted, and that all claims and causes of action asserted by plaintiff, Brenda Mitchell, against defendant, Sikorsky Aircraft Corporation, be, and are hereby, dismissed with prejudice.

SIGNED March 14, 2012.

_____
JOHN McBRYDE
United States District Judge

18